**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION**

| | |
|---|---|
| **Mary E. Allen, Gayle Lindsey, Vicki L. Kirsch, Jessica M. Barnes, Denise L. Gibson, Robert John Metty, Jr., Deandrea K. Dawson, Martha Gough, Kace Browning, Sheila Bozeman, Rebekah Nolan, Mittie J. Waller, Michelle Winkler, Nancy B. Lay, Hayley Hinote, Kristan Harley, individually and as parent and next friend of S.M.H. and H.J.H., minors, Falyn Martin, Chaz Riley, Philip Hughes Moon, Mary Katherine Beckham, Joseph A. Rogers and James T. Waters,** ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| **Plaintiffs,** ) | **Civil Action No. 3:10-CV-00142-MCR-CJK** |
| ) | |
| **v.** ) | |
| ) | |
| **School Board for Santa Rosa County, Florida, and Tim Wyrosdick, in his official capacity as Superintendent, Santa Rosa County School District,** ) ) ) ) ) ) | |
| **Defendants.** ) ) ) | |

**FIRST AMENDED COMPLAINT FOR PRELIMINARY AND PERMANENT
INJUNCTIVE RELIEF, DECLARATORY JUDGMENT AND DAMAGES**

Plaintiffs, MARY E. ALLEN, GAYLE LINDSEY, VICKI L. KIRSCH, JESSICA M.

BARNES, DENISE L. GIBSON, ROBERT JOHN METTY, JR., DEANDREA K. DAWSON,

MARTHA GOUGH, KACE BROWNING, SHEILA BOZEMAN, REBEKAH  NOLAN,

MITTIE J. WALLER, MICHELLE WINKLER, NANCY B. LAY, HAYLEY HINOTE,

KRISTAN HARLEY, individually and as parent and next friend of S.M.H. and H.J.H., minors,

FALYN MARTIN, CHAZ RILEY, PHILIP HUGHES MOON, MARY KATHERINE

BECKHAM, JOSEPH A. ROGERS and JAMES T. WATERS, by and through counsel, file this

civil action and respectfully request this Court to issue injunctive relief, a declaratory judgment and award damages for violations of the United States Constitution by Defendants, SCHOOL BOARD FOR SANTA ROSA COUNTY, FLORIDA (hereinafter "School Board") and TIM WYROSDICK, in his official capacity as SUPERINTENDENT, SANTA ROSA COUNTY SCHOOL DISTRICT (hereinafter "Superintendent"). In support thereof, Plaintiffs state:

1.      Plaintiffs seek preliminary and permanent injunctive relief enjoining Defendants from enforcing against Plaintiffs the policies Defendants consented to by virtue of entering into a Consent Decree and Order, which was subsequently entered by the United States District Court for the Northern District of Florida on May 6, 2009 (hereinafter "Consent Decree"), as well as the policies and guidelines Defendants adopted to implement the Consent Decree (hereinafter "Policies"), and from violating Plaintiffs' rights to freedom of speech, freedom of association, equal protection, and free exercise of religion guaranteed by the First and Fourteenth Amendments to the United States Constitution, and violating the Establishment Clause contained in the First Amendment to the United States Constitution.

2.      Plaintiffs also pray for a declaratory judgment determining the constitutionality of the Consent Decree and Defendants' Policies and actions in denying Plaintiffs the opportunity to exercise their constitutional rights and in themselves violating the Establishment Clause, and to declare the Consent Decree, and Defendants' Policies, both on their face and as applied, unconstitutional as a direct violation of the First and Fourteenth Amendments to the United States Constitution.

3.      Plaintiffs also seek damages.

4.     An actual controversy exists between the parties involving substantial constitutional issues, in that the challenged Consent Decree and Defendants' Policies, on their face and as applied, violate the United States Constitution and have infringed Plaintiffs' rights.

## JURISDICTION AND VENUE

5.     This action arises under the First and Fourteenth Amendments to the United States Constitution and is brought pursuant to 42 U.S.C. § 1983.

6.     This Court has jurisdiction under, and by virtue of, 28 U.S.C. §§ 1331.

7.     Venue is proper under 28 U.S.C. § 1391 (b). Each and all of the acts alleged herein were done by Defendants in Santa Rosa County, Florida, under the color and pretense of the statutes, ordinances, regulations, customs, policies, procedures, and law of the School Board and/or the State of Florida.

8.     This Court is authorized to grant declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02, implemented through Federal Rule of Civil Procedure 57, and to issue injunctive relief under Federal Rule of Civil Procedure 65.

9.     This Court is authorized to grant Plaintiffs' prayer for relief regarding costs, including a reasonable attorney's fee, under 42 U.S.C. § 1988.

## PARTIES

### Employee Plaintiffs

10.     Plaintiff GAYLE LINDSEY (hereinafter "Lindsey") is a natural born person who resides in Pace, in Santa Rosa County, Florida. She is an employee of Defendant School Board, and has been so employed for approximately twenty (20) years. Lindsey currently teaches tenth grade biology at Pace High School.

11.     Plaintiff VICKI L. KIRSCH (hereinafter "Kirsch") is a natural born person who resides in Pace, in Santa Rosa County, Florida. She is an employee of Defendant School Board, and has been so employed for nineteen (19) years. Kirsch currently teaches third grade at S.S. Dixon Intermediate School.

12.     Plaintiff JESSICA M. BARNES (hereinafter "Barnes") is a natural born person who resides in Cantonment, in Escambia County, Florida. She is an employee of Defendant School Board, and has been so employed for three (3) years.

13.     Plaintiff DENISE L. GIBSON (hereinafter "Gibson") is a natural born person who resides in Milton, in Santa Rosa County, Florida. She is an employee of Defendant School Board, and has been so employed for nine (9) years. Gibson currently teaches first grade at W.H. Rhodes Elementary School.

14.     Plaintiff ROBERT JOHN METTY, JR. (hereinafter "Metty") is a natural born person who resides in Pace, in Santa Rosa County, Florida. He is an employee of Defendant School Board, and has been so employed for six (6) years. Metty currently teaches special education classes at Pace High School.

15.     Plaintiff DEANDREA K. DAWSON (hereinafter "Dawson") is a natural born person who resides in Pace, in Santa Rosa County, Florida. She is an employee of Defendant School Board, and has been so employed for approximately ten (10) years. Dawson currently teaches Law Studies and American History at Pace High School, where she also coaches the varsity cheerleaders.

16.     Plaintiff MARTHA GOUGH (hereinafter "Gough") is a natural born person who resides in Pace, in Santa Rosa County, Florida. She is an employee of Defendant School Board, and has been so employed for eighteen (18) years. Gough currently teaches reading at Pace High

School, where she sometimes also teaches career, personal and school development, and where she also assists in coaching the volleyball team.

17.     Plaintiff KACE BROWNING (hereinafter "Browning") is a natural born person who resides in Pace, in Santa Rosa County, Florida. She is an employee of Defendant School Board, and has been so employed for six (6) years. She currently teaches reading and literature at Pace High School.

18.     Plaintiff SHEILA BOZEMAN (hereinafter "Bozeman") is a natural born person who resides in Pace, in Santa Rosa County, Florida. She is an employee of Defendant School Board, and has been so employed for eighteen (18) years. Bozeman currently teaches kindergarten at W.H. Rhodes Elementary School.

19.     Plaintiff REBEKAH NOLAN (hereinafter "Nolan") is a natural born person who resides in Pace, in Santa Rosa County, Florida. She is an employee of Defendant School Board, and has been so employed for approximately seventeen (17) years. Nolan currently teaches fifth grade at W.H. Rhodes Elementary School.

20.     Plaintiff MITTIE J. WALLER (hereinafter "Waller") is a natural born person who resides in Milton, in Santa Rosa County, Florida. She is an employee of Defendant School Board, and has been so employed for thirty-six (36) years. Waller currently teaches kindergarten at W.H. Rhodes Elementary School.

21.     Plaintiff NANCY B. LAY (hereinafter "Lay") is a natural born person who resides in Pace, in Santa Rosa County, Florida. She is an employee of Defendant School Board, and has been so employed for seven (7) years. Lay currently teaches reading and literature at Pace High School.

22.     Plaintiffs Lindsey, Kirsch, Barnes, Gibson, Metty, Dawson, Gough, Browning, Bozeman, Nolan, Waller, and Lay are hereinafter collectively referred to as "Plaintiff Employees."

### Former Student Plaintiffs

23.     Plaintiff MARY E. ALLEN (hereinafter "Allen") is a natural born person who currently resides in Tallahassee, in Leon County, Florida. She is a student at the Florida State University. In 2009, Allen was a senior at, and graduated from, Pace High School.

24.     Plaintiff FALYN MARTIN (hereinafter "Martin") is a natural born person who graduated from Pace High School in 2010.

25.     Plaintiff CHAZ RILEY (hereinafter "Riley") is a natural born person who resides in Milton, in Santa Rosa County, Florida. He graduated from Milton High School in 2010.

26.     Plaintiff HAYLEY HINOTE (hereinafter "Hinote") is a natural born person who graduated from Pace High School in 2010.

27.     Plaintiffs Allen, Martin, Riley, and HAYLEY HINOTE are hereinafter collectively referred to as "Former Student Plaintiffs."

### Student Plaintiffs

28.     Plaintiff KRISTAN HARLEY is a natural born person who resides in Pace, in Santa Rosa County, Florida. She is the mother of three minor students enrolled in the Defendant School Board's public schools: L.H., who is in sixth grade, H.J.H, who is in ninth grade, and S.M.H., who is in eleventh grade. Plaintiff Kristan Harley sues both in her individual capacity and in her representative capacity as parent and next friend of S.M.H. and H.J.H.

29.     Plaintiffs S.M.H. and H.J.H. are hereinafter collectively referred to as "Plaintiff Students."

**Parent Plaintiffs**

30.     Plaintiff PHILLIP HUGHES MOON (hereinafter "Moon") is a natural born person who resides in Pace, in Santa Rosa County, Florida. He is the father of C.M., a minor student enrolled in the tenth grade at Pace High School.

31.     Plaintiff MARY KATHERINE BECKHAM (hereinafter "Beckham") is a natural born person who resides in Pace, in Santa Rosa County, Florida. She is the mother of R.B., a minor student enrolled in the eleventh grade at Pace High School.

32.     Plaintiffs Kristan Harley, individually, Moon and Beckham are hereinafter collectively referred to as "Plaintiff Parents."

**Local Community Plaintiff**

33.     Plaintiff MICHELLE WINKLER (hereinafter "Winkler") is a natural born person who resides in Santa Rosa County, Florida. She is a former employee of Santa Rosa County Schools. Winkler is deeply concerned about the students and employees of the District, and desires to offer Bible and other religious studies in District facilities.

34.     Plaintiff JOSEPH A. ROGERS (hereinafter "Rogers") is a natural born person who resides in Pace, in Santa Rosa County, Florida. He is the Senior Pastor at Pace Assembly Ministries.

35.     Plaintiff JAMES T. WATERS (hereinafter "Waters") is a natural born person who resides in Milton, in Santa Rosa County, Florida. He is the Associate Pastor, Minister to Students at First Baptist Church of Milton.

36.     Plaintiffs Rogers and Waters are hereinafter collectively referred to as "Pastor Plaintiffs."

**Defendants**

37.     Defendant School Board is the governing body for public schools in Santa Rosa County, Florida, with the authority to sue and be sued, and was at all times material acting within the course and scope of its authority and under color of law.

38.     Defendant Superintendent is and was at all times relevant herein, Superintendent of Schools for the District, acting within the course and scope of his authority as Superintendent, under color of Florida state law and consistent with the custom, policy, practice, and use of the Santa Rosa County School District (hereinafter "School District").

## STATEMENT OF FACTS

**The Prior Litigation and the Consent Decree**

39.     On or around August 27, 2008, Minor Doe I and Minor Doe II, through their parents, Parent I Doe and Parent II Doe, appeared as plaintiffs in a complaint filed against the Defendants School Board and Superintendent, and against H. Frank Lay in his official capacity as principal of Pace High School.

40.     Before filing an Answer, Defendants School Board and Superintendent, together with H. Frank Lay, in his official capacity, filed a "Notice of Admission of Liability" dated December 15, 2008. It stated, in part, "Defendants hereby provide notice that they admit liability in this action and acknowledge that plaintiffs are entitled to certain relief."

41.     Subsequently, those parties jointly requested a temporary injunction which the court entered without the required findings of fact and conclusions of law explaining the reasons for its issuance.

42.     After Defendant School Board voted to approve its language, Defendants submitted to the court, again without the required statements of reasons why the injunction it

contained was issued, the stipulated Consent Decree which was entered by the court on May 6, 2009. A copy of the Consent Decree is attached hereto as Exhibit A and incorporated herein.

43.     The Consent Decree contains, among other things, broad prohibitions against religious speech and expression by Defendants' employees, including Plaintiff Employees, anytime those employees are present at a "School Event," regardless of whether they are there in their official or private capacity.

44.     In fact, according to the Consent Decree, employees of the Defendants, including Plaintiff Employees, cannot be present at any School Event in their private, non-official capacity.

45.     On the contrary, according to the Consent Decree, "if these persons are present at a School Event, then they are present in their official capacity."

46.     Since "School Events" are "any happening sponsored, approved or supervised by a School Official," the Consent Decree limits and restricts legitimate, private religious speech and expression anytime school employees are present anywhere on school grounds, including, for example, during lunch breaks, before school, after school, or while watching their children or grandchildren compete at a scholastic sporting event that they voluntarily attend outside of school hours.

47.     On or about May 22, 2009, Plaintiff Employees received from Defendant School Board a copy of the Consent Decree.

48.     Along with the Consent Decree, Plaintiff Employees received a memorandum from Defendant Superintendent. In this memo, Defendant Superintendent directed Plaintiff Employees to comply with the Consent Decree, and advised that if they violate it either intentionally or unintentionally, Plaintiff Employees will be disciplined at work and possibly terminated, as well as subject to fines, penalties and sanctions from the court. A copy of

Defendant Superintendent's memorandum is attached hereto as Exhibit B and incorporated herein.

## The Mootness of the Consent Decree

49.     On May 30, 2009, Minor Doe I and Minor Doe II graduated from Pace High School.

50.     Upon graduation, Minor Doe I and Minor Doe II lost any interest in enforcement of the Consent Decree, and thereby lost standing for any court to maintain any continuing jurisdiction to enforce the Consent Decree.

## The School Board's Policies, and Its Interpretation and Application of the Consent Decree

51.     Defendant School Board has also provided Plaintiff Employees with Policies as to how it will interpret and apply the Consent Decree. One version of some of the Policies provided by Defendant School Board is attached hereto as Exhibit C and incorporated herein.

52.     Many of these Policies are vague and inconsistent, and they create more confusion about what conduct is permitted and what conduct is prohibited.

53.     For example, while the Consent Decree (Exhibit A) strictly prohibits Defendants' employees, including Plaintiff Employees, from placing any religious object, such as a Bible or devotional book, regardless of size or manner of display, on the School Board's tangible property (such as a desk), the School Board's Policies (Exhibit C) purport to allow employees to display religious "personal items," including Bibles, as long as they are not "prominently displayed" and "oversized."

54.     Similarly, the School Board's Policies prohibit teachers from using phrases such as "God Bless You" in email communications, or even replying to such communications received from parents or other third parties.

55.     Neither Defendant School Board nor the Consent Decree differentiate between Plaintiff Employees' conduct at school as school officials, such as when they are coaching or teaching a class, and their conduct at school as private persons, such as when they are taking a lunch break, or during other non-instructional times when students are not around them, or when Plaintiff Employees attend an evening sporting event to watch students compete, even when those students are their own children or grandchildren.

56.     Instead, the Consent Decree dictates that Plaintiff Employees can never be at a school event, such as a sporting event, or in their planning periods or lunch breaks, in their private capacities. According to the Consent Decree and Defendant School Board's Policies, every single time Plaintiff Employees are present at an event that has been approved by school officials, whether before school, during school or after school, and whether on school grounds or off school grounds, Plaintiff Employees are automatically deemed to be present there in their official capacities and subject to the mandates and prohibitions of the Consent Decree.

57.     Moreover, the Consent Decree defines, and the School Board interprets, the word "Prayer" broadly, to include not just communications with a deity in the traditional sense, where the person praying postures with head bowed, eyes closed and hands folded, but any form of religious expression or conduct, such as engaging in religious discourse, reading or discussing the Bible, or merely greeting other individuals with "God Bless You" or "I am praying for you."

58.     The School District has actually applied the Consent Decree in this manner to prohibit the foregoing expression and conduct.

### The Employee Plaintiffs

59.     As a result, Defendant School Board's Policies, and the Consent Decree, restrict and infringe upon Employee Plaintiffs' constitutional rights by prohibiting them from engaging

in the following activities and conduct which they have done in the past, and/or which they would do but for those prohibitions:

a.      Plaintiffs Lay, Lindsey, Kirsch, Barnes, Gough, Browning, Bozeman and Waller: Keep their personal Bible and/or a small devotional book on their desk in their classroom, and/or keep small and discrete inspirational quotes, some of which are from the Bible, in their personal work area near their desk, to read to themselves during non-instructional time when students are not present, and to inspire them to be better, more caring teachers;

b.      Plaintiff Lay: Wear on her person to school jewelry in the shape of a cross that has great inspirational significance to her;

c.      Plaintiffs Kirsch, Dawson, Gough, Browning, Bozeman and Nolan: Use words and phrases in oral or written on-campus communications, including emails, that were an integral part of their vocabulary, such as "God bless you today," "I'm praying for you," "You are in my thoughts and prayers," "thank God for that," "good heavens," "thank heavens," "God is in control," "God will take care of you" or simply "Bless you";

d.      Plaintiffs Gibson and Waller: Interact freely with the adult parents of their students, who often bring up matters of faith and religion in their verbal and written communications (including emails), because the Defendant School Board's Policies, and the Consent Decree, forbid them from acknowledging or responding to those voluntary, parent-initiated comments, and therefore interfere with and diminish their teacher-parent relationships;

e.      Plaintiffs Lay, Gough and Browning: Host and/or attend a voluntary Bible study for or with adult colleagues in the mornings at school, during non-instructional time before students arrive;

f.      Plaintiffs Lay, Lindsey, Kirsch, Barnes, Gibson, Dawson, Gough, Browning, Bozeman, Nolan and Waller: Pray with adult colleagues, talk freely and openly with them about matters of faith and religion, or ask them for prayer in return, during off-the-clock breaks and/or non-instructional times when no students are present, such as would routinely happen when a colleague or Plaintiff Employees are going through a difficult situation, a sickness or the loss of a loved one. Indeed, the 2009-2010 school year was particularly tough for Plaintiff Gibson because she was dealing with serious illness in her immediate family, and was unable to solicit and receive the prayerful support of her colleagues as had been their custom and practice prior to entry of the Consent Decree.

g.      Plaintiff Waller: Pray silently with her head bowed for her own lunch during lunch time, while students are eating their lunches nearby;

h.      Plaintiffs Lindsey, Barnes and Browning: Pray, silently with bowed head by themselves or audibly with other adults, for their food, for the safety of the players, or for the recovery of an injured player during non-instructional time at school events that they voluntarily attend on their own time, such as scholastic sporting competitions and events, school performances, holiday celebrations or lunch and snack breaks;

i.      Plaintiff Lindsey: Pray and read her Bible, silently and to herself, on long bus rides when she accompanies the school football team to away games and during a football game itself;

j.      Plaintiff Kirsch: Pray with other adults for her grandchildren and other student athletes at school sporting events which she attends voluntarily, as a grandmother, on her own time, outside of school hours;

k.      Plaintiff Kirsch: Pray with her adult colleagues at evening, off-campus events that they sometimes plan jointly at school and that they attend voluntarily for team-building, camaraderie, to honor a colleague or to celebrate a holiday or special occasion;

l.      Plaintiff Gibson: Organize, coordinate and/or host voluntary, on-campus, faith-based support groups during non-instructional times for her fellow teachers who were going through difficult personal situations, such as dealing with divorce, death or illness;

m.      Plaintiffs Kirsch and Browning: Attend with their children or grandchildren "See You at the Pole" and other community prayer events held on school grounds, outside of school hours, which are voluntarily attended by students, parents and community members;

n.      Plaintiffs Lay, Lindsey, Barnes, Dawson, Browning, Bozeman and Nolan: Show respect for students when they engage in voluntary prayer in Plaintiff Employees' presence during non-instructional time, such as would routinely occur at lunch time or sport competitions, by being silent, bowing their head, and/or folding their hands;

o.      Plaintiffs Lay, Lindsey, Barnes and Browning: Speak at religious student clubs, such as Fellowship of Christian Athletes or First Priority, during non-instructional time and outside of school hours, when invited to speak by student organizers on their own initiative;

p.      Plaintiffs Dawson and Browning: Pray for and with a student going through a difficult time, at that student's request, during non-instructional time, on campus or off-campus at a school event, such as a sports or cheerleading competition, a banquet or a field trip;

q.      Plaintiffs Lindsey and Gough: Identify themselves as religious persons and followers of Christ on the Internet webpage dedicated to them by Defendant School Board, where they are otherwise invited to reveal other personal hobbies and interests to let the community know who they are;

r.      Plaintiffs Dawson and Browning: Use the Bible as a teaching tool within accepted curricular standards, to teach, for example, early American history, Social Darwinism, Imperialism, or the literature of various periods and cultures and the historical and factual context and circumstances of such literature;

s.      Plaintiff Gibson: Recognize and commemorate the different facets and aspects of the federal, state and local holiday of Christmas, by displaying, among various secular ornaments, an angel on her classroom Christmas tree, and by having the students voluntarily perform, among various secular songs, some traditional Christmas carols;

t.      Plaintiffs Gough and Browning: Plan and organize, during their free, non-instructional time on campus or off-campus, privately-sponsored, voluntary, religious baccalaureate services held off campus or in privately-rented school facilities for their students or former students when they graduate; and

u.      Plaintiffs Lay, Lindsey, Kirsch, Barnes, Metty, Dawson and Browning: Participate in privately-sponsored, voluntary, religious baccalaureate services held off campus at a house of worship or in privately-rented school facilities for Plaintiff Employees' students or former students when they graduate, including praying out loud, being recognized for their contributions as teachers, sitting with fellow educators and wearing school colors or other educator attire, such as their college graduation gowns.

60.     Defendant School Board and the Consent Decree place many restrictions on Plaintiff Employees' ability to attend privately-sponsored religious baccalaureate services, and those restrictions have been an especially difficult area for many employees of Defendant School Board.

61.     Plaintiff Metty has attended several privately-sponsored religious baccalaureate services in the past, to support graduating students from Pace High School, and plans to do so again in the future. His daughter graduated from Pace High School in May 2010 and his son is currently enrolled in the eleventh grade at Pace High School. His freedom to sit with whomever he wants, including fellow teachers, and to wear whatever he wants, including a graduation gown, at privately-sponsored, voluntary, religious baccalaureate services held outside of school hours at a house of worship, is very important to him. His wife is also a teacher at Pace High School, as are many of his good friends. He wants to be able to sit with them, or with anyone else he chooses. He also wants to be able to be recognized as a teacher for his contribution to the success of the graduating seniors.

62.     Plaintiff Metty advised Defendant Superintendent and Defendant School Board's attorney, Mr. Paul Green, that he takes his rights as an individual citizen when he is off the clock very seriously, that he planned to attend the 2010 privately-sponsored baccalaureate service for his daughter and the other Pace High School Seniors, and that he planned to sit where he wanted, with whomever he wanted within the house of worship that hosted the event. He also advised them that he planned to wear whatever he wanted at the baccalaureate service, including attire that may have identified him as a teacher. Defendant Superintendent and Mr. Green warned Plaintiff Metty that if he did any of the above, he would have violated Defendant School Board's

policy and the Consent Decree, and would have been subject to discipline and contempt sanctions.

63.    In fact, due to the threat of discipline and contempt sanctions, and due to the uncertainty and confusion in Defendants' policies and the Consent Decree, Plaintiff Metty did not attend the 2010 baccalaureate service honoring his own daughter. However, Plaintiff Metty desires to attend the 2011 baccalaureate service, as well as future services in order to support graduating Pace High students, which will soon include his son, without the threat of discipline or sanctions.

64.    Furthermore, Defendant School Board's Policies and the Consent Decree violate Plaintiff Employees' constitutional rights because they force them to engage in the following conduct which Plaintiff Employees do not wish to engage in, and which Plaintiff Employees would not engage in but for those mandates:

a.    Plaintiffs Lay, Lindsey, Kirsch, Gibson, Dawson, Gough, Browning, Bozeman, Nolan and Waller: Censor Plaintiff Employees' students and prohibit them from discussing matters of faith or religion in school assignments, speeches, performances and presentations that Plaintiff Employees review, even if such discussions are germane to the topics assigned and are voluntarily chosen by the students themselves; and

b.    Plaintiffs Lay, Lindsey, Kirsch, Barnes, Dawson, Gough and Browning: Prohibit parents and other adult third parties from engaging in any prayer at athletic competitions and other school events, such as routinely occurs when a student athlete is injured.

65.    Plaintiff Employees do not wish to engage in such censorship, disclaimers and other compelled conduct because they fear they may be sued by students, parents and other third parties whose rights they are forced to violate, but nonetheless they are forced to engage in such

conduct under threat of discipline from Defendant School Board or contempt sanctions from a court. Plaintiff Employees also do not wish to engage in such censorship, disclaimers and other compelled conduct because they sincerely believe that the students, parents and other third parties have the freedom and constitutional right to engage in religious activities without fear of censorship by Plaintiff Employees or other representatives of the government.

66.     Defendant School Board and the Consent Decree are also interfering with Plaintiff Employees' constitutional rights by compelling them to be hostile towards voluntary, student-initiated and/or student-led religious expression.

67.     Defendant School Board and/or the Consent Decree compels Plaintiff Metty to disclaim routine, voluntary, student-led and student-initiated religious expression, including prayers, devotions and formal or informal conversations regarding matters of faith and religion, and routinely uttered religious speech amongst students, such as "God Bless You," "Jesus Loves You," "come to church with me this Sunday" and other similar phrases. School officials have instructed him to issue a disclaimer every time a student spontaneously prays or engages in religious discourse in his presence. No other form of speech or expression has to be disclaimed. Defendant School Board and/or the Consent Decree have singled out religious speech and expression for this discriminatory and hostile treatment.

68.     Plaintiff Metty does not want to issue disclaimers when students spontaneously pray or engage in religious discourse in his presence because it requires conduct that is far from neutral towards the religious expression of the students – it is outright hostile. Besides being disrespectful towards the students, this type of compelled speech is not conducive to healthy and productive teacher-student relationships. The only reason he has issued disclaimers against religious expression in the past, and will continue to do so in the future, is because he is

compelled to do so by Defendant School Board policy and/or the Consent Decree, under pain of discipline or contempt sanctions.

69.     Plaintiff Employees are personally aware that three employees of Defendant School Board, including Plaintiff Winkler and Plaintiff Lay's husband, recently had to answer to civil and even criminal contempt charges because their religious expression was alleged to violate Defendant School Board policy and/or orders of the same federal court that issued the Consent Decree.

70.     The individual forced to defend herself in civil contempt proceedings is Plaintiff Winkler. One of those individuals charged with criminal contempt, and threatened with jail, fines, and the loss of decades worth of accrued retirement benefits, is H. Frank Lay, the husband of Plaintiff Lay and the former principal of Plaintiff Employees who work at Pace High School.

71.     Plaintiff Employees do not wish to test the limits of their constitutional liberties, and to risk losing their jobs or to face civil or criminal sanctions for their conduct, as did their three colleagues.

72.     Therefore, if Plaintiff Employees have any doubt about whether their constitutionally-protected conduct is permitted under Defendant School Board's Policies and/or the Consent Decree, Plaintiff Employees will err on the side of caution and voluntarily censor themselves.

73.     Plaintiff Employees will also voluntarily censor themselves in instances where Defendant School Board tells them that Plaintiff Employees can engage in conduct which is prohibited by the terms of the Consent Decree, because Plaintiff Employees know that they are ultimately responsible to the court for their conduct, and Defendant School Board has told them

that it will not defend Plaintiff Employees if they are accused of a violation, intentional or unintentional.

74.     In fact, as a result of these concerns over discipline or prosecution, Plaintiff Employees have censored their own conduct and reluctantly relinquished their constitutional rights on multiple occasions since the entry of the Consent Decree, and Plaintiff Employees will continue to do so until a court intervenes to restore their rights.

75.     Other similarly situated employees of Defendants routinely engage in similar activities and speech as contemplated by Plaintiff Employees, but from a nonreligious viewpoint, and are not subjected to the restraints, restrictions and outright prohibitions that the Employee Plaintiffs have suffered. For example, teachers can and do form support groups, that do not discuss religious matters, without violating Defendants' Policies or the Consent Decree.

### Former Student Plaintiffs

76.     It has long been the policy, practice, custom and tradition at Pace High School to allow the student body President, the Senior Class President, the valedictorian, and the salutatorian to make brief remarks at the graduation ceremony on subjects of his or her choice.

77.     Plaintiff Allen was the student body President, elected by her fellow students at Pace High School, for the 2008-2009 school year.

78.     As duly elected student body President at Pace High School, Allen earned the right to address her fellow graduating seniors at her graduation ceremony.

79.     Plaintiff Allen was excited about speaking at graduation and had looked forward to it all year. This was going to be her final opportunity to address her classmates and to give them a proper send-off to college or wherever else their lives would take them. Speaking at graduation was extremely important to Allen.

80.     Plaintiff Allen's school mates wanted her to address them at graduation, as well. In fact, when they elected Plaintiff Allen to lead them as their student body President, they did so voluntarily, without any adult pressure or influence, and they intended and expected that, as their President, she would address them at graduation.

81.     Included in the remarks Plaintiff Allen was planning to make during her brief inspirational message was to thank those individuals who had influenced her and who had helped her to succeed in high school. Among those individuals were her parents, some of her teachers, and God. She also planned to encourage her classmates to have hope as they go out into the world, because God loves them and has great plans for them.

82.     Plaintiff Allen was confused, shocked and devastated when she heard on the evening news, approximately ten days before graduation that she would not be allowed to speak at her graduation. Through a statement released by the attorneys for Defendant School Board, she learned that only the valedictorian and salutatorian would now be permitted to speak at graduation, despite the fact that the student body President had spoken at graduation every year for the last thirty or more years, and despite the fact that she was elected senior class President and thus had earned the right to speak.

83.     The next day, Plaintiff Allen went to the Office of Defendant Superintendent, to ask for an explanation. Defendant Superintendent told Allen she would not be allowed to speak because her remarks would cause the District to violate the recently entered Consent Decree.

84.     Defendant Superintendent claimed that because some teachers at Pace High School could vote and might have voted along with the thousands of students that elected Allen to be their President, and because those teachers might have known of her religious convictions, she was not neutrally selected and therefore could not speak.

85.     Incongruously, the valedictorian and salutatorian at Pace High School were not prohibited from speaking, even though the grades that elevated them to those positions were given by Pace High School teachers.

86.     Moreover, there was no indication that any teacher who voted for Allen was improperly influenced by Allen's religious convictions.

87.     Even if a handful of teachers did actually vote in the student election, and even if they might have been unduly influenced by Allen's faith, Allen's margin of victory among the student voters was large enough that those teacher votes could not have altered the results.

88.     After Plaintiff Allen explained those things to Defendant Superintendent, and after pleading with him not to take away her right to speak simply because she might allude to her faith or God, he remained steadfast and would not permit Allen to address her classmates at graduation.

89.     Defendants' decision to silence Allen injured her in that it was a devastating, distressing and demoralizing denial of her First Amendment right to speak, which has shaken her belief in the First Amendment, and caused her to question whether she is a citizen of "the Land of the Free."

90.     Defendants' decision to silence Allen also punished her for being a Christian because she was powerless to change who she is, how others view her and the reasons they voted for her to speak at graduation.

91.     Defendants' conduct has caused Allen damages.

92.     Plaintiff Riley graduated from Milton High School in 2010.

93.    In May 2009, Plaintiff Riley participated in graduation exercises with the senior class at Milton High School, in his capacity as a student government leader (not as a graduating senior).

94.    During a practice run through of that graduation ceremony, one school official sternly warned every student there that anyone who would initiate or participate in any prayer during the graduation ceremony would be ejected immediately. The school official warned against participation in voluntary, student-led and student-initiated prayer at any time during the graduation ceremony.

95.    In 2010, Plaintiff Riley and the other students were again warned against praying during the graduation ceremony. They were specifically warned not to attempt to engage the audience in prayer, or to ask them to recite any prayer in unison.

96.    As President of the student body, Plaintiff Riley addressed his class at the 2010 graduation. Although he did offer a short prayer at the beginning of his speech, and many in the audience bowed their heads out of respect, the teachers and staff were prohibited from doing so by the policies and the Consent Decree.

97.    Defendants' conduct as alleged herein cast a pall over the proceedings, despite Plaintiff Riley's brief prayer, and inhibited the free speech and freedom of exercise of religion during the 2010 graduation ceremonies.

98.    Additionally, in June 2009, Plaintiff Riley, as the elected student body President, was asked by an Assistant Principal at Milton High School to write a "welcome letter" addressed to the student body, which would be published in the agenda planners and distributed to each student in August 2009.

99.     Plaintiff Riley was happy to comply with the Assistant Principal's request and address the student body. He drafted a short letter in which he welcomed the students back to school, challenged them to work hard to succeed, and encouraged them to have fun and take advantage of all that Milton High School has to offer. A copy of the letter, as initially drafted by Riley, is attached hereto as Exhibit D and incorporated herein.

100.     The letter drafted by Riley was not religious in nature. He ended his draft letter with the following phrase:

> Let's enjoy being Panthers and make Milton proud.
>
> Good luck and God Bless,
>
> Your Student Body President,
>
> Chaz Riley

101.     "God Bless" is an expression Plaintiff Riley uses often, especially as parting words. It is his way to inspire, encourage and challenge those with whom he comes into contact. He also regards the phrase as a patriotic one, which has been part of our American heritage, and which the President of the United States uses often when addressing Americans, including school children. The phrase is important to Plaintiff Riley, and was an important component of his written welcome address to the student body at Milton High School.

102.     Plaintiff Riley submitted a draft of his "welcome letter" to the Assistant Principal, who forwarded it to William Emerson, the Director of High School Education for the Santa Rosa County Defendant School Board. Mr. Emerson then forwarded the letter to Paul Green, an attorney for the School Board. A copy of these communications is attached hereto as Exhibit E and incorporated herein.

103.    Plaintiff Riley was shocked, saddened and dismayed when, after discussion with Mr. Emerson and Mr. Green, his Assistant Principal told him that he was required to remove the phrase "God Bless" from his letter to the student body.

104.    As shown in Exhibit E, Mr. Green concluded that the phrase "God Bless" would fall "within the definition of Prayer" in "Para[graph] 3(b)" of the Consent Decree. Exhibit E further documents that Mr. Green concluded that "Para[graph] 5(e)" of that Consent Decree required school officials to censor "God Bless" from Riley's letter, because "God Bless" constituted the "offering [of] a prayer" under the Consent Decree.

105.    Mr. Emerson agreed with Mr. Green's interpretation and direction, and directed the Assistant Principal to censor Plaintiff Riley's letter and cleanse it of the "God Bless" "prayer."

106.    The Assistant Principal complied with the censorship order and Plaintiff Riley's letter to the Milton High School student body was published without the "God Bless" ending he chose. A copy of the censored letter as published is attached hereto as Exhibit F and incorporated herein.

107.    Mr. Green's and Mr. Emerson's decision to deny Plaintiff Riley's First Amendment right to speak and express himself, and to censor "God Bless" from his written address to the students under his leadership, caused him great sadness, distress and personal anguish. No one has been able to explain to him why, as an American living in Santa Rosa County, Florida, and as the duly elected President of the student body at his school, he does not have the same right to freely speak and express himself as are enjoyed by Americans elsewhere, including the President of the United States.

108.    Defendants' conduct as alleged herein has caused Riley damages.

109.     Plaintiff Martin, who recently graduated from Pace High School, was a member of First Priority, a Christian extra-curricular club at Pace High School that met once per week at school, before the start of classes.

110.     First Priority's meetings were entirely voluntary – no one was forced to attend or participate. The meetings included religious devotions and prayers, and discussion of character, integrity and other life issues from a Christian perspective, usually facilitated by a guest speaker.

111.     School officials and the Consent Decree interfered with First Priority's ability to organize and conduct successful First Priority activities and events, and their right to receive information protected by the First Amendment.

112.     School officials and the Consent Decree prohibited teachers and staff from coming to speak at First Priority meetings, even though the students took the initiative to invite them, and even though the speeches of teachers and staff would have taken place outside of school hours, during non-instructional time, before a voluntary high school audience.

113.     In addition, school officials prohibited teachers and staff from serving as advisors to First Priority, strictly limiting their involvement in the club to that of chaperones to ensure physical safety of members.

114.     Other student extra-curricular clubs had faculty and staff advisors that helped the students plan and organize events, invite speakers and deal with administrative club and membership issues.

115.     There were several teachers and staff at Pace High School that would have readily served First Priority in this capacity, but they were prohibited from doing so by school officials and by the Consent Decree.

116.    This put the entire burden of organizing and running the First Priority club on students, and deprived the club of any input or advice from adults that were very willing to provide it. This hurt the club and its members, including Plaintiff Martin, preventing them from receiving messages they desired to receive, putting them at a disadvantage.

117.    In addition, school officials prohibited First Priority from inviting "regular" outside guest speakers. There were a few community members whom the club members enjoyed listening to, and whom First Priority regularly invited to speak. This was beneficial to First Priority not only because the members enjoyed listening to those speakers, but because the speakers got to know the members, and were able to tailor their speeches accordingly.

118.    School officials prohibited First Priority from inviting the same person to speak on multiple occasions, forcing the members instead to find a brand new speaker every week and denying them the right to hear from the speakers they chose.

119.    This deprived First Priority members, including Plaintiff Martin, from being able to hear from their first choice as speakers, and interfered with their ability to achieve continuity, warmth and familiarity in their club meetings. There were many weeks when First Priority was unable to secure a brand new speaker, and ended up with no speaker at all, which hurt the club and its members further.

120.    Defendants' restrictions and prohibitions on "regular" outside guest speakers served no legitimate or compelling government interest.

121.    Defendants' restrictions and prohibitions on Plaintiff Martin's meetings and activities violated her First Amendment rights.

122.    To the extent the Equal Access Act is construed or applied in a manner inconsistent with Plaintiff Martin's and other Plaintiffs' First Amendment rights, it is unconstitutional.

123.    Prior to the Consent Decree, Plaintiff Martin had no difficulty approaching teachers whom she respected and knew from outside of school (such as from church or the community), sharing a problem or concern with them, and asking for their advice and prayers. Plaintiff Martin would initiate such conversations during non-instructional time, and would routinely bring up matters of faith and religion, expecting and enjoying a two-sided, productive conversation. These interactions helped Plaintiff Martin build great relationships with her teachers, which significantly aided her education.

124.    Plaintiff Martin was not able to have these conversations with her teachers after the entry of the Consent Decree, not because her teachers did not want to help her, but because they were prohibited from doing so and were afraid of being disciplined or prosecuted.

125.    There was a spirit of fear among Plaintiff Martin's teachers, and they were reluctant to even acknowledge her personal and spiritual needs and remarks, much less engage in the productive, two-sided conversations that they used to have.

126.    Whenever Plaintiff Martin approached them with a problem, issue or conversation that had a spiritual or religious component, no matter how tangential, her teachers either ignored her comments, or quickly changed the subject, or told her outright that they could not respond or help her.

127.    This impeded Plaintiff Martin's relationship with her teachers, including her ability to trust them and have confidence in them, which adversely affected her education.

128.    These actions of Defendants also caused Plaintiff Martin to self-censor her own messages, and in some cases not even to attempt to speak to her teachers due to the prohibitions on their responding in any meaningful way to Plaintiff Martin and her needs.

129.    Defendants' conduct as alleged herein has caused Martin damages.

130.    Plaintiff Hinote recently graduated from Pace High School. During her time at Pace, she and other students frequently engaged in voluntary student-initiated and student-led prayer. However, Hinote and the others were told that they could get teachers and staff in trouble if they prayed in the presence of or near the teachers or staff, even though the teachers did not join in the prayer.

131.    Plaintiff Hinote was told by school officials that teachers and staff will get in trouble with Defendant School Board or the court if they are near when students choose to pray, even if the teachers and staff are not actually praying with the students, because someone might think that the teachers and staff "look like they are praying," or that they are endorsing the students' prayer if they are present and do not stop it, speak against it or dishonor it.

132.    Plaintiff Hinote did not want to get her teachers and staff in any trouble, so she limited her voluntary devotions and prayers in the short periods of free time when no adults were present.

133.    Plaintiff Hinote and her fellow students thus felt rushed and afraid to pray.

134.    Plaintiff Hinote and her fellow praying school mates were always nervous that an adult would walk in and catch them doing something they were not supposed to do, or witness something they were not supposed to see. Their prayers and devotions were hampered, restricted, and limited as a result, and they were not nearly as enjoyable and effective as they were in the past.

135.    Defendants' conduct as alleged herein has caused Plaintiff Hinote damages.

**The Current Student Plaintiffs**

136.    S.M.H. has been a member of the Pace High School Band since ninth grade.

137.    In or around May 2009, her band colleagues selected her to be chaplain for the band. No adult told the band members to select any chaplain, or to select S.M.H. as their chaplain. Instead, her band colleagues decided on their own that they wanted a student to lead them in a short devotion and prayer during "down time" or "free time" before band performances, and they selected her for that role.

138.    These devotions and prayers were completely voluntary. No one was forced or pressured to participate, and no one was embarrassed or made fun of if they chose not to participate.

139.    S.M.H. was excited about serving as chaplain for her band colleagues and desired to do so. She saw it as an excellent way to build friendships and for band members to prepare their minds and hearts for performing.

140.    S.M.H. was very sad and upset when she learned just a few days after she was elected that Defendant School Board would not allow her to serve as a student-elected chaplain nor allow band members to select any chaplain. School officials told her that she could not be a chaplain because the Consent Decree prohibited school organizations from having any kind of chaplain.

141.    S.M.H. was stripped of her position by school officials, preventing her from serving her fellow band members as chaplain.

142.    S.M.H. continues to desire to serve her band colleagues as their chaplain and, if allowed, would do so immediately and continue serving as chaplain until her graduation.

143.    Unless this Court intervenes to protect S.M.H.'s rights, she will continue to be denied the opportunity to serve as a student-elected chaplain for her fellow band members and the Consent Decree and school officials are going to continue to limit and restrict S.M.H.'s right and the rights of her band colleagues, to engage in voluntary, student-led and student-initiated prayers and devotions before band performances.

144.    In the Spring of 2009, while H.J.H. was in the seventh grade at Sims Middle School, she and some of her school mates began a practice of reciting a verse from the Bible in the cafeteria, just before eating their lunch. One of the students would pick the "verse of the day" and share it with a few other students. A few of the students would print the verse and distribute it to those students who wanted to participate. Then, just before they ate lunch, they would recite the verse together.

145.    The Bible verse recitation was entirely voluntary. None of the students were required to participate, and no student was made to feel bad or embarrassed for not participating.

146.    The Bible verse recitation was initiated by students and led by students. No adult encouraged the students to read any verse, told them which verse to pick, or participated in any way in this exercise. It occurred during the students' free time, when they were not in class and when they were allowed to speak out loud about anything they wanted.

147.    The Bible verse recitation was not disruptive and did not bother other students. No student complained about this exercise.

148.    The Bible verse recitation took place without incident for three or four days. It was popular, in fact. H.J.H. enjoyed it because it allowed her to give thanks for the food she was eating, and to focus on things that matter to her during a pause from the stressful school day. The verse recitation inspired her to be a better student, and to care for her fellow school mates.

149.     After three or four days, the Sims Middle School principal arrived as H.J.H. and her school mates were preparing to read the day's verse, and told them that they were no longer permitted to recite the daily verse, and that they would be disciplined if they continued.

150.     Because they were afraid of being disciplined, H.J.H. and her school mates immediately stopped reciting the Bible verse at lunch, and they have not done it ever since.

151.     H.J.H. wants to resume reading a Bible verse at lunch with those school mates who also want to do it. If school officials allow them to do this, H.J.H. wants to start right away and continue the practice for as long as she can.

152.     Additionally, the Consent Decree and school officials have further restricted or prohibited students, including S.M.H., from engaging in voluntary, student-led and student-initiated devotions and prayers during non-instructional time at school.

153.     S.M.H. and the other members of the Pace High School Band were told by school officials that their teachers and other band leaders will get in trouble with Defendant School Board or the court if they are near when students voluntarily pray. Because S.M.H. and other praying students do not want their teachers and other leaders to get into any trouble, they try to squeeze their voluntary devotions and prayers in the short periods of down time when no adults are present.

154.     S.M.H. and her fellow students thus feel rushed and afraid to pray.

155.     S.M.H. and her fellow praying school mates are always nervous that an adult will walk in and catch them doing something they are not supposed to do, or witness something they are not supposed to see. Their prayers and devotions have been hampered, restricted, and limited as a result, and they are not nearly as enjoyable and effective as they were in the past.

156.    H.J.H., S.M.H. and others want to be able to resume their practice of praying or reading the Bible with those school mates who want to join them in such voluntary activities during non-instructional time, without fear of disciplinary actions against them or their teachers.

157.    Faith and religious expression are very important to Student Plaintiffs and to many of their friends and school mates.

158.    Students, including the Student Plaintiffs, wish to engage in voluntary, student-led and student-initiated prayers, devotionals and other forms of religious expression during their free time on campus, such as before classes start, after classes end, during lunch, at student government potluck lunches, at sports banquets or during informal gatherings.

159.    In the 2009-2010 school year, the Consent Decree and school officials created a climate that is very hostile to religious expression by students, including Plaintiff Students. That hostile climate has continued in the current 2010-2011 school year. Plaintiff Students are made to feel like prayer is something dirty and shameful that can be done in secret only, when no adults are present.

160.    Unless this Court intervenes to protect the rights of Plaintiff Students, they will continue to be denied the opportunity to freely and openly engage in voluntary, student-led and student-initiated prayers, devotions and other forms of religious expression during non-instructional time at school.

161.    Student Plaintiffs have suffered injuries and damages as a result of Defendants' conduct and the Consent Decree.

**The Parent Plaintiffs**

162.    Plaintiff Moon's son is a member of the Pace High School band. Moon has been involved with the band as a parent-volunteer since his son's freshman year.

163.     Among many of the activities Plaintiff Moon participated in are chaperoning band outings, driving the truck with band equipment at band events, assisting band students with carrying band equipment to the actual location of a performance, and maintaining and repairing band equipment.

164.     Plaintiff Moon has also been a member of the Band Boosters, a school support organization that coordinates band volunteer activities.

165.     Plaintiff Beckham's daughter is a member of the Pace High School band. Beckham was also involved with the band as a parent-volunteer for two years, her daughter's freshman and sophomore years, but not since.

166.     Among many of the activities Plaintiff Beckham participated in are selling concessions at band events, fundraising for the band and chaperoning band outings.

167.     Plaintiff Beckham was also a member of the Band Boosters but was forced to discontinue that involvement this year.

168.     Being a band volunteer is very important to Plaintiff Moon and remains important to Plaintiff Beckham, because it allows them to be involved in their children's education, and to contribute to their community.

169.     Plaintiff Moon enjoys being a volunteer, and wishes to continue to volunteer for as long as his son remains in the band, and possibly beyond.

170.     Plaintiff Beckham greatly enjoyed being a volunteer and wishes to continue to volunteer indefinitely.

171.     In or around September 2009, Defendant School Board required parent volunteers and the Band Boosters to adopt and subscribe to "new school board rules … regarding 'religion in schools.'" Among those rules is a prohibition that "Parent/chaperone must not enter into a

dialogue with students regarding religion, religious views or the like." A copy of the rules which Defendant School Board imposed on parent volunteers, such as Plaintiffs Moon and Beckham, is attached hereto as Exhibit G and incorporated herein.

172.     Volunteers, including Moon and Beckham, were told they were required to accept and sign this new rule if they wanted to continue their involvement as parent volunteers with the band.

173.     Plaintiffs Moon and Beckham object to this rule because it is unconstitutionally overbroad.

174.     Plaintiffs Moon and Beckham have no interest in pushing their religious views on anyone, especially students. They have no interest in using their positions as parent volunteers to persuade students to believe the same things they believe.

175.     At the same time, however, Plaintiffs Moon and Beckham want to be free to discuss religion or religious views with others who initiate such conversations with them. For example:

a.      if a student asks Plaintiff Moon or Beckham where either attends church, what time church services start, or what their faith believes and how it is different from another faith, they want to be able to answer such questions in a straightforward, honest and non-threatening fashion;

b.      if a student asks Plaintiff Moon or Beckham what Hindus or Muslims or Catholic Christians or Baptist Christians believe as the band bus passes by a house of worship, Plaintiffs Moon and Beckham want to be able to answer this question truthfully and pedagogically, to the best of their ability, without trying to convert the student to adopt any religious views;

c.      if a student asks Plaintiff Moon what he thinks the role of God is in our government and public life, Plaintiff Moon would like to discuss the teachings of our founding fathers, his own opinions, and how our current government and courts have handled these issues;

d.      if a student asks Plaintiff Beckham what our founding fathers believed about the role of God in society and government, and how that squares with the beliefs of our current politicians, she wants to be able to share the facts she knows, as well as her honest thoughts and opinions on that subject;

e.      if a student asks Plaintiff Moon what he believes about the theory of evolution and the origins of humans, Plaintiff Moon would like to answer those questions based upon his life experience and his training and professional experience as a former science teacher, which discussion likely will include the idea of a Creator;

f.      if a student asks Plaintiff Moon how he deals with human emotions such as depression, anxiety or grief, Plaintiff Moon wants to be able to respond truthfully, which would include his reliance on family, friends and God to live life everyday; and

g.      if a student asks Plaintiff Moon whether he thinks capital punishment or abortion is morally right or wrong, or asks Plaintiff Beckham whether she thinks assisted suicide or infanticide is morally right or wrong, they want to be able to share their opinions, including the factual, legal, ethical, moral and religious principles supporting their opinions.

176.    Those types of discussions have taken place in the past, when students initiated them, and those types of questions are very likely to be asked again in the future.

177.    Religious issues and matters of faith are important to a majority of band members at Pace High School, and they are well educated and intellectually equipped to form their own opinions and share them with others.

178.     Defendant School Board's current policy prohibits Plaintiffs Moon and Beckham from merely discussing the foregoing matters (and other similar subjects) while serving as parent volunteers.

179.     There are no similar restrictions placed on topics other than religion, perhaps with the exception of profanities or obscenities.

180.     That discussion of religious subjects is equated with obscenities is itself obscene to Plaintiffs Moon and Beckham.

181.     Plaintiff Moon is very concerned that if he violates Defendant School Board's policy, he may be prohibited from continuing to serve as a parent-volunteer. This concern has caused him to self-censor his speech, and he will continue to do so until and unless this Court intervenes to restore his rights.

182.     Because Plaintiff Beckham refused to accept Defendant School Board's unconstitutional limitation on her First Amendment rights, she was precluded from serving as a parent volunteer for the 2009-2010 school year, and has been similarly precluded during the 2010-2011 school year.

183.     Plaintiffs Beckham and Kristan Harley are very involved in their daughters' education.

184.     One way they stay involved and informed is through formal and informal conferences and discussions with their daughters' teachers. Through such discussions, they communicate about their daughters' assignments, their successes and challenges, their behavior and outlook on their education, and their goals and objectives.

185.    Because faith is a very important aspect of the lives of the Beckham and Harley families, matters of faith and religion routinely come up in conversations between both Plaintiffs Beckham and Kristan Harley and their daughters' teachers.

186.    For example, they might discuss an issue their daughters are facing, and they would bring up a lesson they studied at church, or something they read in the Bible as a family, and then discuss how those principles relate to the issue at hand. Similarly, in passing they might discuss events or sermons at their church, especially with those teachers who attend the same church. Plaintiff Beckham might discuss a particular Christian song her daughter would perform in an upcoming student competition. Often, Plaintiffs Beckham and Kristan Harley would bring up a recent joy or struggle in their families' life, and ask a teacher they knew shared their faith to pray for them and with them. Plaintiff Kristan Harley did this, for example, when her oldest daughter suffered a sports injury that kept her out of school for an extended period of time.

187.    Those routine discussions and communications, which Plaintiffs Beckham or Kristan Harley or their daughters would initiate with these teachers, were an important aspect of the parent-teacher relationship. They were an integral part of the overall communications. They allowed Plaintiffs Beckham and Kristan Harley to develop a meaningful relationship with their daughters' teachers, which provided the basis for open and frank discussions about their daughters' educations and their futures. This was of great benefit to Plaintiffs Beckham and Kristan Harley as parents, and to their daughters as students.

188.    In addition, Plaintiff Kristan Harley routinely uses religious phrases in her written and verbal communications, because of the way she was brought up and because her faith is so important to her. Her communications with her daughter's teachers, both written and verbal, are no exception. For example, Plaintiff Kristan Harley often says or writes things such as: "You've

blessed my daughter," or "You are such a blessing to me," or "God is so good," or "God Bless You." She has often included such phrases in email discussions with her daughters' teachers.

189.    Since entry of the Consent Decree and adoption of the School Board policies, Plaintiff Beckham's and Plaintiff Kristan Harley's ability to communicate openly and build relationships with their daughters' teachers has been severely limited.

190.    As a result of the Consent Decree, Defendant School Board has prohibited teachers from engaging in any conversations with Plaintiffs Beckham and Kristan Harley that involve or touch upon matters of faith and religion.

191.    Now, whenever Plaintiffs Beckham and Kristan Harley bring up any subject dealing with church, faith or religion, their daughters' teachers are afraid to discuss their thoughts openly with them. The teachers either ignore them, or quickly change the subject, or they tell Plaintiffs Beckham or Kristan Harley that they cannot respond or engage with them in such conversations, despite the fact that all are consenting adults with a mutual goal – the welfare of the daughters of Plaintiffs Beckham and Kristan Harley.

192.    In addition, when Plaintiff Kristan Harley attempts to communicate with her daughters' teachers through email, and Plaintiff Kristan Harley includes a question or solicits information on some issue, and also brings up one or more of the religious phrases discussed above, Plaintiff Kristan Harley either does not receive a response at all, or she receives a brand new email communication that omits her initial question or comment.

193.    Plaintiff Kristan Harley understands that the teachers do this because they have been instructed by school officials not to "reply" to emails containing religious remarks, so as not to incorporate (voluntarily or involuntarily) those remarks into the teachers' responses.

194.    This prohibition has caused confusion in their email communications, because Plaintiff Kristan Harley cannot always tell from the incomplete "response" which question or issue the teacher is addressing.

195.    This prohibition and confusion has in turn led Plaintiff Kristan Harley to self-censor her own communications in an effort to re-open lines of communication with the teachers and avoid the need to patch together broken email strings and the like. In some instances, Plaintiff Kristan Harley was forced to forego attempting to communicate at all.

196.    As a result of these difficulties and limitations imposed by school officials and the Consent Decree, Plaintiffs Beckham's and Kristan Harley's parent-teacher relationships have suffered and deteriorated significantly, and will likely continue to suffer to the detriment of their daughters until those unreasonable communication restrictions between willing adults are removed.

197.    Parent Plaintiffs have suffered injuries and damages as a result of Defendants' conduct and the Consent Decree.

**The Local Community Plaintiffs**

198.    Plaintiff Rogers has planned, organized and conducted baccalaureate services for graduating seniors at Pace High School in the past, and will continue to do so in the future.

199.    Similarly, Plaintiff Waters annually organizes and leads a baccalaureate service for the graduating class at Milton High School.

200.    Last year, in or around May 2009, Plaintiffs Rogers and Waters were the principal organizers of the baccalaureate services for the graduating classes of the high schools in their respective communities, for the benefit of the Pace High School senior class and the Milton High School senior class, respectively.

201.    The principal attendees of the Pace and Milton baccalaureates were the graduating seniors in whose honor the event was taking place. Without the graduating seniors, there would be no reason for the events, and Plaintiff Pastors would not have organized them.

202.    Although all students and their families were invited to attend the Pace and Milton baccalaureates services, no one was required to attend. The events were entirely voluntary for all involved.

203.    The events took place outside of regular school hours.

204.    The Pace baccalaureate took place outside of school grounds, specifically, in the auditorium at Pace Assemblies Ministries, Plaintiff Roger's church.

205.    Plaintiff Waters rented the auditorium at Milton High School for the Milton baccalaureate.

206.    Defendant School Board's facilities are generally available for rental during off-school hours by private individuals and entities for community events, and they are routinely used in that fashion.

207.    The baccalaureate rental at Milton High School was on the same terms (including rental fees) applicable to all other private individuals and groups.

208.    Plaintiff Pastors organized most of the details for their respective events.

209.    These were difficult tasks because Plaintiff Pastors were unable to enlist the help of volunteers from their own churches and communities who were employed by Defendant School Board. Those would-be volunteers were prohibited by school officials and the Consent Decree from assisting Plaintiff Pastors, even on their own, non-instructional time, and they were afraid of being disciplined by Defendant School Board or held in contempt by a court.

210.    For example, Plaintiff Waters asked Carol Jones, a member of his church, for assistance with organizing and running the Milton baccalaureate service. Mrs. Jones has been employed by Defendant School Board since 1986, and has been teaching American History at Milton High School since 1993. She is also the alumni coordinator, and has invaluable experience in planning and coordinating baccalaureate services.

211.    Plaintiff Waters was eager to have Mrs. Jones help during her own, non-instructional time, including evenings and weekends.

212.    Mrs. Jones agreed to help and was eager to help, until she was told by Paul Green, Defendant School Board's attorney, that if she provided any assistance, she "will ride with Frank Lay to see Judge Rodgers," meaning that she will be charged criminally for contempt of court. Mrs. Jones thus was afraid to assist and declined to be involved.

213.    Plaintiff Waters also asked Sheila Thompson, another church member who plays the piano at his church, to play the piano at the baccalaureate service, as she had done many times in the past.

214.    Mrs. Thompson, who has worked for Defendant School Board for 30 years and currently teaches chorus at Milton High School, readily accepted, and was eager to play the piano.

215.    However, on the eve of the event, she was told by school officials, School Board members and Mr. Green that she could not play the piano, because a) someone might think that Defendant School Board was sponsoring the event; and b) the event met the definition of "School Event" in the Consent Decree because it was held in rented school facilities and geared primarily to students, and thus no school employee could lead the event.

216.    Mrs. Thompson was prohibited from playing the piano by Defendant School Board even after she assured school officials that she would play the piano in her personal capacity, on her own time, outside of school hours, at a privately-sponsored event.

217.    Because she was afraid of being disciplined or held in contempt of court, Mrs. Thompson declined to play the piano, and Plaintiff Waters was forced to find a replacement.

218.    Moreover, Plaintiff Pastors encountered several problems and difficulties during the events themselves.

219.    As part of the religious celebration and thanksgiving, Plaintiff Pastors wanted to recognize and thank the teachers that had made it possible for the graduating seniors to succeed. The best way to do this would have been to seat all of the teachers together in one bloc, just as the students were seated in a bloc, and to publicly recognize and thank the teachers for their service during the baccalaureate events.

220.    Since the baccalaureates were privately-sponsored religious events, attended voluntarily by students, teachers and community members during non-school hours (with the Pace event even inside of a house of worship), Plaintiff Pastors did not anticipate that there would be any problems or issues in organizing and conducting the event as Plaintiff Pastors wanted.

221.    Plaintiff Pastors were disheartened and dismayed, however, when they learned and witnessed that the teachers who voluntarily attended these privately-sponsored community events, on their own time (and in Pace at a house of worship), were actually afraid to, and did not, sit together.

222.    The teachers also were afraid to stand and be recognized, or to participate in any way in the services.

223.    The teachers had been admonished by school officials not to sit together or participate in the baccalaureate service, and they were threatened with disciplinary action and contempt sanctions if they disobeyed.

224.    This provided for a chilly atmosphere at both events and transformed what should have been warm and joyous occasions into sometimes awkward, sometimes uneasy, and sometimes tense events.

225.    All of the foregoing difficulties and problems Plaintiff Pastors encountered with organizing and conducting the baccalaureate services for the two Santa Rosa graduating classes last year were rooted in Defendant School Board's Policies, and its interpretation and application of the Consent Decree.

226.    Among other restrictions, the Consent Decree and Defendant School Board prohibit teachers who attend privately-sponsored, voluntary religious events, held outside of school hours, from sitting together in one bloc, from wearing similar graduation attire (*e.g.*, school colors or graduation gowns), or from leading or directing the baccalaureate services, whether the events are held inside a house of worship off campus or inside a privately rented auditorium on campus.

227.    The Consent Decree and Defendant School Board also prohibit teachers and staff employed by Defendant School Board from assisting in planning, organizing, financing or promoting the baccalaureate service, especially during free or non-instructional time on campus.

228.    Defendants School Board and Superintendent have interpreted and applied the Consent Decree in a manner consistent with these limitations, and have threatened to discipline any teacher or staff member who disobeys.

229.    Because the worship and expression communicated and sought to be communicated during and through these baccalaureate services are both corporate and individual, the actions and policies of Defendants set forth above infringed and interfered with the Plaintiff Pastors' rights to the free exercise of religion as well as their rights to free speech, hampering their message and hindering their worship experience.

230.    In 2010, Plaintiff Pastors organized and conducted baccalaureate services for their respective communities' high school graduating classes.

231.    Once again, the Pace baccalaureate was held at Plaintiff Rogers' church, while Plaintiff Walters rented the Milton High School auditorium for the Milton baccalaureate.

232.    Because the Milton baccalaureate service was held in rented facilities at Milton High School, the Consent Decree, on its face and as interpreted and applied by Defendants again deemed it a "School Event," because the principal attendees were students.

233.    Because Plaintiff Waters' privately-sponsored religious baccalaureate service is a "School Event," the Consent Decree, on its face and as interpreted and applied by Defendants prohibits school officials, including teachers and staff, from participating in any prayer or religious activity during the baccalaureate service.

234.    Moreover, school officials are required by the Consent Decree, on its face and as interpreted and applied by Defendants to prohibit any non-student third parties (such as parents, Plaintiff Waters, any religious leaders, or any community members) from engaging in any prayer during the baccalaureate service.

235.    The concerns of Plaintiff Pastors were confirmed by the 2010 services, and the difficulties and problems they had encountered in 2009 were repeated.

236.    The Consent Decree, on its face and as interpreted and applied by Defendants grossly interferes with Plaintiff Pastors' ability to organize and conduct a privately-sponsored religious baccalaureate service, whether in a house of worship or privately rented School District facility.

237.    The Consent Decree, on its face and as interpreted and applied by Defendants precludes Plaintiff Pastors from seating participants at these religious events according to Plaintiff Pastors' own consciences, tastes, preferences and religious convictions.

238.    The Consent Decree, on its face and as interpreted and applied by Defendants precludes Plaintiff Pastors from asking that attendees coordinate their dress to aid the function, presentation and decorum of the events.

239.    The Consent Decree, on its face and as interpreted and applied by Defendants interferes with Plaintiff Pastors' ability to publicly thank and recognize teachers for their selfless service to the graduating classes.

240.    The Consent Order, on its face and as interpreted and applied by Defendants precludes Plaintiff Pastors from obtaining help of church members and community members in the leading or direction of the baccalaureate services, including Plaintiffs Gough and Browning, simply because they happen to work for Defendant School Board.

241.    In addition, again in 2010, individuals employed by Defendant School Board, such as Plaintiffs Gough and Browning, were prohibited from assisting with organizing the baccalaureate, or from actively participating in the service, with the exception of Mrs. Thompson, who was granted special dispensation to play the piano. Otherwise, they and their colleagues, including Plaintiffs Lay, Lindsey, Kirsch, Barnes, Metty, Dawson and Browning,

were again prohibited from sitting together, or from being recognized as teachers who contributed to the success of the graduating seniors honored at the baccalaureate.

242.    Under these circumstances, it was again extremely difficult for Plaintiff Pastors to organize and conduct warm, joyous, efficient and effective baccalaureate services for Santa Rosa County graduating seniors, who deserve to have one.

243.    The above conduct of Defendants and the Consent Decree have therefore interfered with the free exercise rights of Pastor Plaintiffs.

244.    Another way Plaintiff Waters ministers to students is by organizing and conducting private religious activities for school-age children.

245.    Prior to the issuance of the Consent Decree, Plaintiff Waters organized and led at least two such offerings in Santa Rosa County: "Youth Alive" at Hobbs Middle School, and "Differencemakers" at King Middle School. In both instances, Plaintiff Waters organized the programs, created a curriculum, and led the clubs for students who voluntarily attended them outside of regular school hours.

246.    Among other things, Plaintiff Waters would teach students about responsibility, character, moral values, civic duties and the importance of hard work, all from a Bible-based, Christian perspective.

247.    Since the Santa Rosa County School Board makes public school facilities available for use by private individuals and groups outside of regular school hours, Plaintiff Waters decided that it would be most convenient to conduct these programs at public school facilities, so that students can attend them without the need for separate transportation to an off-campus facility.

248.     Prior to the issuance of the Consent Decree, the programs were a great success and very popular with students and parents looking for an enrichment activity to supplement their studies. Around fifteen students attended each program, which met once per week at each school.

249.     After the Consent Decree was issued, however, school officials felt compelled by the Consent Decree to prohibit Plaintiff Waters from regularly attending these programs. They told him that, because of the Consent Decree, Plaintiff Waters could no longer be a regular speaker at the very programs he organized. Because Plaintiff Waters has been prohibited from attending the meetings, the programs have suffered due to the lack of consistent leadership.

250.     Defendant School Board and the Consent Decree prohibit non-student third parties, such as Plaintiff Waters or any other volunteer leaders, from engaging in any religious activity, including prayer, sermons and devotionals, at on-campus events where the principal attendees are students, even where the events are privately-sponsored and held outside school hours in rented school facilities.

251.     Religious activities, including prayer and devotionals, are core functions and purposes of Plaintiff Waters' programs and without them, the programs would not exist or make any sense.

252.     Without adult, non-student leaders such as Plaintiff Waters or another church volunteer leading and participating in prayers and devotions, these programs cannot function, especially at the elementary and middle school levels.

253.     Plaintiff Waters very much desires and intends to continue to participate in the student programs Plaintiff Waters organized, or to participate in new, religious student programs

that Plaintiff Waters will privately sponsor and conduct for students on a voluntary basis at their schools, before or after classes.

254.    However, Plaintiff Waters is prohibited from doing so by the Consent Decree, on its face and as interpreted and applied by Defendants, because such activities are deemed "School Events" since they are principally attended by students.

255.    Unless and until this Court intervenes, Plaintiff Waters' First Amendment rights as a private citizen will continue to be infringed every day.

256.    For the same reasons, Plaintiff Winkler's First Amendment rights as a private citizen are also being infringed and will continue to be infringed, because Plaintiff Winkler desires to organize and offer private Bible and other religious studies in District facilities, both for students and separately for faculty and staff, outside of school hours. Under the terms of the Consent Decree and Policies, however, she, like Plaintiff Waters, is prohibited from doing so because such activities are deemed "School Events."

257.    The Consent Decree and other Policies and actions of Defendants are clear, blatant and intentional violations of well-established law.

258.    Due to Defendants' unconstitutional interpretation and application of the Consent Decree, as well as other Policies and actions of Defendants, Plaintiffs have been irreparably harmed and have suffered damages.

**COUNT I**
**VIOLATION OF PLAINTIFFS' FREEDOM OF SPEECH**
**UNDER THE UNITED STATES CONSTITUTION**

259.    Plaintiffs hereby reiterate and adopt each and every allegation in the preceding paragraphs numbered 1 through 258.

260. The Free Speech Clause of the First Amendment to the United States Constitution, in conjunction with the Fourteenth Amendment, prohibits Defendants from abridging Plaintiffs' freedom of speech.

261. Defendants' actions, Policies, and the Consent Decree, on their face and as applied, deny Plaintiffs the ability to communicate with others concerning religious matters on the same basis as others are permitted to communicate on non-religious matters.

262. Defendants' actions, Policies, and the Consent Decree, on their face and as applied, discriminate amongst similarly situated persons or groups, including the fora of School Board facilities available for rent, graduation platform podiums, other student speeches and addresses, student organization meetings, student organization leadership posts, student organization guest speaker opportunities, voluntarily attended "School Events" during non-instructional time, desktops and other personal work spaces of Plaintiff Employees, lunchrooms, flagpole areas, teacher internet web pages, teacher emails, teacher conferences and school volunteer positions and opportunities.

263. Defendants' actions, Policies, and the Consent Decree, on their face and as applied, discriminate on the basis of content and/or viewpoint by singling out religious speech and expression for negative and discriminatory treatment.

264. Defendants' actions, Policies, and the Consent Decree, on their face and as applied, constitute an unconstitutional prior restraint on speech.

265. Defendants' actions, Policies, and the Consent Decree, on their face and as applied, unconstitutionally limit the speech of Plaintiff Employees while they are not acting as government employees.

266.    There is no compelling government interest sufficient to justify Defendants' actions in applying the Consent Decree together with other Policies in an unconstitutional manner against Plaintiffs.

267.    Defendants' actions, Policies, and the Consent Decree, on their face and as applied, are not the least restrictive means to accomplish any permissible government purpose sought to be served.

268.    Defendants' actions, Policies, and the Consent Decree, on their face and as applied, are not narrowly tailored restrictions on free speech.

269.    Defendants' actions, Policies, and the Consent Decree, on their face and as applied, do not serve a significant government interest.

270.    Defendants' actions, Policies, and the Consent Decree, on their face and as applied, do not leave open ample alternative channels of effective communication.

271.    Defendants' actions, Policies, and the Consent Decree, on their face and as applied, are unreasonable, and impose unjustifiable restrictions on constitutionally-protected speech.

272.    Defendants' actions, Policies, and the Consent Decree, on their face and as applied, unconstitutionally chill and abridge the right of Plaintiffs to engage in free speech guaranteed by the First Amendment.

273.    Plaintiffs have no adequate remedy at law to correct the continuing deprivation of their most cherished constitutional liberties.

274.    As a direct and proximate result of Defendants' continuing violations of Plaintiffs' First Amendment rights, Plaintiffs have suffered in the past, and will continue to suffer in the

future, direct and consequential damages, including but not limited to, the loss of their ability to exercise their constitutional rights.

WHEREFORE, Plaintiffs respectfully pray that the Court grant the relief set forth herein.

## COUNT II
## VIOLATION OF PLAINTIFFS' FREEDOM OF
## ASSOCIATION UNDER THE UNITED STATES CONSTITUTION

275.    Plaintiffs hereby reiterate and adopt each and every allegation in the preceding paragraphs numbered 1 through 258.

276.    Plaintiffs' right to freely associate is protected by the First Amendment to the United States Constitution, in conjunction with the Fourteenth Amendment.

277.    Defendants' actions, Policies, and the Consent Decree, on their face and as applied, unconstitutionally limit the free association rights of Plaintiff Employees while they are not acting as government employees.

278.    Defendants' actions, Policies, and the Consent Decree, on their face and as applied, unconstitutionally limit the free association rights of Plaintiff Students in student organizations (including selection of the leadership posts for those student organizations), in religious services, and in private events utilizing rented School District facilities.

279.    Defendants' actions, Policies, and the Consent Decree, on their face and as applied, unconstitutionally limit the free association rights of Plaintiff Parents.

280.    Defendants' actions, Policies, and the Consent Decree, on their face and as applied, unconstitutionally limit the free association rights of Plaintiff Pastors.

281.    There is no compelling government interest sufficient to justify Defendants' action in applying the Consent Decree together with other Policies to Plaintiffs.

282.    Defendants' actions, Policies, and the Consent Decree, on their face and as applied, are not the least restrictive means to accomplish any permissible government purpose sought to be served.

283.    Defendants' actions, Policies, and the Consent Decree, on their face and as applied, are not narrowly tailored restrictions on free association.

284.    Defendants' actions, Policies, and the Consent Decree, on their face and as applied, do not serve a significant government interest.

285.    Defendants' actions, Policies, and the Consent Decree, on their face and as applied, are unreasonable, and impose unjustifiable restrictions on constitutionally-protected associations.

286.    Defendants' actions, Policies, and the Consent Decree, on their face and as applied, unconstitutionally abridge the right of Plaintiffs to freely associate as guaranteed by the First Amendment.

287.    Plaintiffs have no adequate remedy at law to correct the continuing deprivation of their most cherished constitutional liberties.

288.    As a direct and proximate result of Defendants' continuing violations of Plaintiffs' First Amendment rights, Plaintiffs have suffered in the past, and will continue to suffer in the future, direct and consequential damages, including but not limited to, the loss of their ability to exercise their constitutional rights.

WHEREFORE, Plaintiffs respectfully pray that the Court grant the relief set forth herein.

## COUNT III
## VIOLATION OF PLAINTIFFS' RIGHT OF
## EQUAL PROTECTION UNDER THE UNITED STATES CONSTITUTION

289.    Plaintiffs hereby reiterate and adopt each and every allegation in the preceding paragraphs numbered 1 through 258.

290.     Plaintiffs' right to equal protection under the laws is protected by the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

291.     Defendants' actions, Policies, and the Consent Decree, on their face and as applied, are unconstitutional abridgements of Plaintiffs' affirmative right to equal protection of the laws, because they specifically target Plaintiffs' religious viewpoints and speech.

292.     Defendants' actions, Policies, and the Consent Decree, on their face and as applied, are unconstitutional because they treat religious speech, religious expression, religious viewpoints and religious conduct differently than they treat secular speech, secular expression, secular viewpoints and secular conduct.

293.     Defendants' actions, Policies, and the Consent Decree, on their face and as applied, are unconstitutional abridgements of Plaintiffs' right to equal protection of the law because Defendants treat Plaintiffs differently from other similarly situated individuals and groups on the basis of Plaintiffs' religious speech, religious expression, religious viewpoint and religious conduct.

294.     Defendants' actions, Policies, and the Consent Decree, on their face and as applied, are not supported by a compelling governmental interest sufficient to justify the punishment against Plaintiffs.

295.     Defendants' actions, Policies, and the Consent Decree, on their face and as applied, are not the least restrictive means to accomplish any permissible government purpose sought to be served.

296.     Defendants' actions, Policies, and the Consent Decree, on their face and as applied, do not serve a significant government interest.

First Amended Complaint – Page 54

297.     Defendants' actions, Policies, and the Consent Decree, on their face and as applied, do not leave open ample alternative channels of communication.

298.     Defendants' actions, Policies, and the Consent Decree, on their face and as applied, are irrational and unreasonable, and impose irrational and unjustifiable restrictions on constitutionally protected speech.

299.     Plaintiffs have no adequate remedy at law to correct the continuing deprivation of their most cherished constitutional liberties.

300.     As a direct and proximate result of Defendants' continuing violations of Plaintiffs' equal protection rights, Plaintiffs have suffered in the past, and will continue to suffer in the future, direct and consequential damages, including but not limited to, the loss of their ability to exercise their constitutional rights.

WHEREFORE, Plaintiffs respectfully pray that the Court grant the relief set forth herein.

## COUNT IV
### VIOLATION OF PLAINTIFFS' RIGHT TO FREE EXERCISE OF RELIGION UNDER THE UNITED STATES CONSTITUTION

301.     Plaintiffs hereby reiterate and adopt each and every allegation in the preceding paragraphs numbered 1 through 258.

302.     Plaintiffs' right to the free exercise of religion is protected by the First Amendment to the United States Constitution, in conjunction with the Fourteenth Amendment.

303.     Prayer, devotionals, Bible reading, Bible studies, Bible verse memorization, religious services, religious meetings, evangelizing, preaching and teaching religious matters and fellowship with fellow believers are all protected forms of religious exercise.

304.     Plaintiffs engage in religious exercises out of sincerely held religious beliefs and convictions.

305.    Defendants' actions, Policies, and the Consent Decree, on their face and as applied, unconstitutionally limit the free exercise rights of Plaintiff Employees while they are not acting as government employees and while on their free time.

306.    Defendants' actions, Policies, and the Consent Decree, on their face and as applied, unconstitutionally limit the free exercise rights of Plaintiff Students, outside of school hours or during non-instructional time at school.

307.    Defendants' actions, Policies, and the Consent Decree, on their face and as applied, unconstitutionally limit the free exercise rights of Plaintiff Parents and Plaintiff Pastors.

308.    These limitations are a substantial burden on Plaintiffs' sincerely held religious beliefs.

309.    There is no compelling government interest sufficient to justify Defendants' actions in applying the Consent Decree together with other Policies to Plaintiffs.

310.    Defendants' actions, Policies, and the Consent Decree, on their face and as applied, are not the least restrictive means to accomplish any permissible government purpose sought to be served.

311.    Defendants' actions, Policies, and the Consent Decree, on their face and as applied, are not narrowly tailored restrictions on free exercise of religion.

312.    Defendants' actions, Policies, and the Consent Decree, on their face and as applied, do not serve a significant government interest.

313.    Defendants' actions, Policies, and the Consent Decree, on their face and as applied, do not constitute neutral laws of general applicability, but instead single out religious speech and conduct for special adverse treatment.

314.     Defendants' actions, Policies, and the Consent Decree, on their face and as applied, are unreasonable, and impose unjustifiable restrictions on constitutionally-protected religious exercise.

315.     Defendants' actions, Policies, and the Consent Decree, on their face and as applied, unconstitutionally abridge the right of Plaintiffs to engage in free exercise of religion guaranteed by the First Amendment.

316.     Plaintiffs have no adequate remedy at law to correct the continuing deprivation of their most cherished constitutional liberties.

317.     As a direct and proximate result of Defendants' continuing violations of Plaintiffs' First Amendment rights, Plaintiffs have suffered in the past, and will continue to suffer in the future, direct and consequential damages, including but not limited to, the loss of their ability to exercise their constitutional rights.

WHEREFORE, Plaintiffs respectfully pray that the Court grant the relief set forth herein.

**COUNT V**
**VIOLATION OF ESTABLISHMENT CLAUSE**
**OF THE UNITED STATES CONSTITUTION**

318.     Plaintiffs hereby reiterate and adopt each and every allegation in the preceding paragraphs numbered 1 through 258.

319.     Defendants' actions, Policies, and the Consent Decree, on their face and as applied, are hostile to religion in violation of the Establishment Clause of the First Amendment to the United States Constitution.

320.     Defendants' actions, Policies, and the Consent Decree, on their face and as applied, single out religious speech, expression and conduct for discriminatory and hostile treatment.

321.    Defendants' actions, Policies, and the Consent Decree, on their face and as applied, require Defendant School Board's employees, including Plaintiff Employees, to be hostile and not accommodating to students, parents, fellow employees and third parties based on their religious speech, expression and conduct.

322.    There is no compelling government interest sufficient to justify Defendants' action in applying the Consent Decree together with other Policies to Plaintiffs.

323.    Defendants' actions, Policies, and the Consent Decree, on their face and as applied, violate the Establishment Clause protections of the First Amendment.

324.    Plaintiffs have no adequate remedy at law to correct the continuing deprivation of their most cherished constitutional liberties.

325.    As a direct and proximate result of Defendants' continuing violations of Plaintiffs' First Amendment rights, Plaintiffs have suffered in the past, and will continue to suffer in the future, direct and consequential damages, including but not limited to, the loss of their ability to exercise their constitutional rights.

WHEREFORE, Plaintiffs respectfully pray that the Court grant the relief set forth herein.

## COUNT VI
## INVALIDATION OF MOOT CONSENT DECREE

326.    Plaintiffs hereby reiterate and adopt each and every allegation in the preceding paragraphs numbered 1 through 258.

327.    On May 30, 2009, Minor Doe I and Minor Doe II graduated from Pace High School, thereby losing any interest in enforcement of the Consent Decree and thereby losing standing for any court to maintain any continuing jurisdiction to enforce the Consent Decree.

328.    Minor Doe I and Minor Doe II have no standing to enforce or seek enforcement of the Consent Decree, because they cannot be harmed by any conduct of the Defendants.

329.    The Consent Decree is moot.

WHEREFORE, Plaintiffs respectfully pray that the Court grant the relief set forth herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A.    That this Court issue a preliminary injunction, enjoining Defendants, their officers, agents, employees and all other persons acting in active concert with them, from enforcing Defendants' Consent Decree together with their other Policies against Plaintiffs in a manner that infringes upon their constitutional rights.

B.    That this Court issue a permanent injunction, enjoining Defendants, their officers, agents, employees and all other persons acting in active concert with them, from enforcing Defendants' Consent Decree together with their other Policies against Plaintiffs in a manner that infringes upon their constitutional rights.

C.    That this Court issue a declaratory judgment declaring that Defendants' Consent Decree together with their other Policies are unconstitutional, both on their face and as applied to Plaintiffs, and declaring that Defendants, their officers, agents, employees and other persons acting in active concert with them, unlawfully obstructed Plaintiffs from exercising their constitutionally-protected rights.

D.    That this Court adjudge, decree, and declare the rights and other legal relations with the subject matter here in controversy, in order that such declaration shall have the force and effect of final judgment.

E.    That his Court invalidate the unconstitutional Consent Decree as moot because there are no plaintiffs with standing to enforce it.

F.    That this Court retain jurisdiction of this matter for the purpose of enforcing this Court's order.

G.    That this Court award Plaintiffs such damages as are just and appropriate.

H.    That this Court award Plaintiffs the reasonable costs and expenses of this action, including attorney's fees, in accordance with 42 U.S.C. § 1988.

I.    That this Court grant such other and further relief as it deems equitable and just under the circumstances.

Respectfully submitted,

/s/ Horatio G. Mihet
Mathew D. Staver
  Florida Bar No.
Anita L. Staver
  Florida Bar No.
Horatio G. Mihet
  Florida Bar No.
LIBERTY COUNSEL
PO Box 540774
Orlando, FL 32854-0774
800-671-1776 Telephone
407-875-0770 Facsimile
court@lc.org

ATTORNEYS       FOR       PLAINTIFFS

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed electronically with the Court this 8th day of April, 2011. Service will be effectuated upon all parties of record by the Court's electronic notification system.

/s/ Horatio G. Mihet

Horatio G. Mihet, Esq.

One of the attorneys for Plaintiffs